**WESSEL, DUVAL & CO., Inc., et al. v. GRACE LINE, Inc.**

Civ. 10-477.

District Court, S. D. New York.

March 3, 1944.

---

Haight, Griffin, Deming & Gardner, of New York City (Edgar R. Kraetzer and Stanley W. Schaefer, both of New York City, of counsel), for plaintiffs.

White & Case, of New York City (Lowell Wadmond, William F. Cogswell, and Orison S. Marden, all of New York City, of counsel), for defendant.

BRIGHT, District Judge.

When this case came on for trial before the court and a jury, after the jury had been selected counsel agreed that there was nothing for the jury to determine, that it might be discharged, and that the case be deemed tried by a jury of one subject to motions by counsel at the close of the case. At the same time, the second cause of action, as well as the second paragraph of the prayer for relief, were withdrawn, and the prayer was further amended so as to set out a demand for judgment for $213,393.88 with interest on $52,635.62 from May 1,

1940 and on $160,758.26 from August 1, 1940.

The complaint, as thus amended, seeks money damages for an alleged breach of a "pooling agreement", dated May 19, 1937, as amended, under which the parties agreed to divide the gross earnings accruing to the vessel of each party out of its freight operations on all cargo originating in the United States, carried therefrom on a vessel of one of said parties, and destined for ports on the west coast of Colombia, Ecuador, Peru and Chile. It is alleged that operations under the agreement began on August 1, 1937, and each party had duly accounted for and paid to the other the sums owing up to and including January 31, 1940.

Recovery to the extent of $83,980.54 is sought for plaintiffs' share of unpaid earnings between February 1 and April 30, 1940, during which it is claimed both parties had sailings within the agreement; and for an additional sum estimated at $195,000 for unpaid earnings alleged to have accrued between May 1 and July 31, 1940, from sailings of the defendant alone. It appears that at a pretrial conference, defendant conceded that there was due to the plaintiffs for the period from February 1 to April 9, 1940, $29,346.60 with interest, which it paid. Plaintiffs' demand was, therefore, amended as stated in the first paragraph.

The particular question of law involved is the construction of the agreement. Plaintiffs "and any interest they may control", called the West Coast Line, and defendant, prior to the agreement, were competing in trade by water between the ports mentioned. They obviously desired to pool the revenues from their business between those ports and to declare that they would not directly or indirectly operate vessels between such ports other than as provided in the agreement. The particular clauses here in controversy provide

"Schedules

"Except as hereinafter provided, and except also for a tolerance of ten percent (10%) one way or the other, as the case may be, the Grace Line shall maintain fifty six (56) passenger and/or freighter sailings per annum, and the West Coast Line shall maintain twenty six (26) freighter sailings per annum, from ports on the Atlantic Coast of the United States to ports on the West Coast of Colombia, Ecuador, Peru and Chile."

"Pooling

"All gross earnings accruing to each vessel of each party hereto out of its freight operations including port and landing charges, and surcharges, on all cargo originating in the United States, carried therefrom on a vessel of one of said parties, and destined for ports on the West Coast of Colombia, Ecuador, Peru, and Chile, shall be divided seventy five percent (75%) to the Grace Line and twenty five percent (25%) to the West Coast Line after deducting four dollars ($4.00) per revenue ton, except on motor cars and trucks on which this deduction shall be fifteen dollars ($15.-00) per unit. The Grace Line and the West Coast Line agree to send their manifests and/or freight lists to each other as soon as practicable after each sailing in order to arrive at a settlement of these percentages, which settlements shall be made in cash at the end of each three month period. Should in future the trade here involved necessitate additional or larger vessels, seventy five percent (75%) of such additional tonnage shall be provided for by the Grace Line and twenty five percent (25%) thereof by the West Coast Line."

The agreement further provided that if the Compania Chilena De Navegacion Interoceanica should become a party to the pooling agreement, it should receive, under certain circumstances, not more than 15% of the total pool, of which the Grace Line agreed to supply 75% and the West Coast Line 25%; and in the event that the Chilean company should withdraw entirely from service, the tonnage represented by it or its substitute, should be provided 75% by the Grace Line and 25% by the West Coast Line. It was also agreed that lines operating regular general cargo service with a frequency of not less than monthly departures from Chile and Peru to European ports via the Panama Canal, might become associates or members of the conference mentioned in the agreement. The agreement was to remain in force for a period of four years, and thereafter, unless either party

gave six months' notice in writing to the other to terminate the same, except that either party would have the right to terminate after the agreement had been in force two and one-half years.

The particular event which precipitated this controversy was the invasion of Denmark by Germany on April 9, 1940, and the declaration of Great Britain and France shortly thereafter that they would seize all Danish vessels as prize. All of the plaintiffs' vessels sailed under the Danish flag, and on April 10 were ordered to proceed to neutral ports, and later, after discharging their cargoes, were immobilized. At the same time, plaintiffs' cancelled sailings under the pooling agreement of six of their vessels, which had been scheduled for April 12, 19, 26 and May 3, 10 and 17.

On April 29, 1940, defendant notified Wessel Duval and the Maritime Commission (by whom the pooling agreement, under the law, was required to and had been approved) that because of the occupation of Denmark and the inability of the Danish freighters to operate as per schedule, a major change had taken place affecting operations under the agreement, and that settlements thereunder would be stopped as of the sailing of defendant's S.S. Santa Ana on April 12, 1940.

On May 20, 1940, Wessel Duval chartered the S.S. Malantic, on June 12, 1940 the S.S. Wind Rush, and on July 6, 1940, the S.S. Carolyn, all with the consent of the Maritime Commission, and those ships sailed from North Atlantic ports to the same ports in South America as the other ships of the West Coast Line on June 9, June 30 and July 20, 1940. There were no sailings of the West Coast Line other than the three mentioned after the invasion of Denmark.

The Grace Line, however, continued its sailings between the ports mentioned in the pooling agreement, 23 being accomplished between April 5 and July 31, 1940.

The dispute really narrows down to whether or not under the agreement each party was bound to maintain substantially regular sailings, the plaintiffs bi-weekly and the defendant weekly. In other words, defendant contends that when the plaintiffs cancelled their weekly sailings in April and

May, following the invasion, they breached their part of the agreement. Plaintiffs answer that they had already had 31 sailings in the year immediately preceding the invasion, and had complied with their part of the contract which required them to maintain 26 freighter sailings per annum; that the contract did not require them to have a regular schedule, and that any attempt to so construe the agreement would be writing into an unambiguous contract something upon which the parties had not agreed. The defendant replies that it was not contemplated that either party should stop operations for any part of the year, but that each should regularly draw its load in earning revenue for the common pool.

The divergence between the parties deals solely with questions of law and arises because plaintiffs contend that the pooling agreement is a definite and certain statement of the obligations of the parties, presenting no element of ambiguity and was duly performed. Defendant urges that the court should look at the surrounding circumstances to see what the parties have in fact said and to scan the performance under the agreement to see what the parties intended it to mean.

█ There seems to be no dispute but that the court may examine into the surrounding circumstances to ascertain the intent of the parties. Prior to the time the agreement became effective, the parties obviously were in competition. It seems fair to assume that they entered into the agreement to obviate some of the disagreeable or unfavorable features of that competition. During the year 1937, prior to the pooling, the West Coast Line had regular semimonthly sailings from New York to the west coast of South America via the Panama Canal. The Grace Line scheduled weekly sailings over substantially the same course to the same ports. In June of 1937, shortly after the agreement had been signed but before its approval by the Maritime Commission and its effective operating date, the West Coast Line changed its advertisement to "Regular fortnightly sailings", and that continued until the end of 1939.

Thus, prior to and at the inception of this agreement, both were operating regular sailings, and that fact, together with the

tonnage represented by the vessels employed by each, and other factors arising from the conduct of their respective businesses, entered into the agreement as to the division of revenues. That the methods and regularity of sailings then in effect should be continued, except for a tolerance of 10% one way or the other, seems to me a fair and reasonable assumption. The requirement of 56 sailings per annum by the Grace Line obviously contemplated its weekly sailing schedule, and the 26 sailings to be maintained by plaintiffs contemplated the continuance of its bi-weekly schedule. It is not to be believed that there was to be any irregular earning of revenue by either; if it had been so contemplated, there would have been no provision for quarterly accountings. Nor is it to be believed that either party contemplated that the other would discontinue its previous practice and thus fail to contribute regularly its share to the pool. And to make sure that each pulled its weight, it was specifically provided that should the trade necessitate additional or larger vessels, the additional tonnage should be provided by both in the proportion in which they were to divide the revenue.

The conduct of the parties prior to and at the time of the execution of the agreement leads me inevitably to the conclusion that it was not contemplated that either would have duly performed all conditions and things under said pooling agreement (and that is plaintiffs' allegation as to its part) unless each continuously and regularly contributed its proportionate share of sailings and revenue so that at the end of each accounting period the proportion which they had contemplated and agreed should belong to each would have been earned by each. It was not intended that full performance on the part of the plaintiffs would have been accomplished if 26 sailings had taken place. It was intended that both should continue with further sailings when the cargo offerings would make possible an increase over the normal earnings. If this were not so, either would be at the mercy of the other, as is amply demonstrated in the present situation, where plaintiffs are seeking to recover 39% more than their total contribution to the pool, as will be hereafter shown.

This leads to the conclusion that the plaintiffs have failed to prove their cause of action, and that they are not entitled to recover any more than was due them when the defendant refused longer to make pool settlements by reason of the discontinuance and cancellation of sailings after April 12, 1940. This would seem to entitle plaintiffs to a recovery over and above the amount which was paid after the pretrial conference above referred to, according to the computation which follows. If the respective shares of the two parties are to be determined as of April 5, 1940, the last sailing before the plaintiffs' ships were immobilized, there was concededly due to plaintiffs $29,346.60, which has already been paid. However, this figure does not take into consideration the sailing of the Santa Ana on April 12, 1940, with which, it will be remembered was stated by the defendant in its letter to the Maritime Commission, further settlements under the agreement would be stopped. This would require a correction in the amount due to plaintiffs. From the exhibits in the case, the following result would be reached:

| | |
|---|---|
| Defendant's total net revenue for the 11th pool period to and including April 5, 1940 | $777,211.28 |
| Add Santa Ana sailing 4/12/40 | 64,963.49 |
| Total defendant's revenue | 842,174.77 |
| Add plaintiffs' revenue | 219,954.39 |
| Total | $1,062,129.16 |
| 25% of which would be | 265,532.29 |
| Plaintiffs' revenue was | 219,554.39 |
| If my mathematics are correct, there would then have been due to plaintiffs for the period when both parties were operating | 45,577.90 |
| Paid | 29,346.60 |
| Leaving a balance of which would be due plaintiffs, with interest from May 1st, 1940. | $16,231.30 |

If the pooling agreement is to be practically construed by what the parties did under it, it is perfectly obvious that they intended that each should have regular sailings so that each would do its share in each three month period, at the end of which there was to be an accounting and distribution. They did so. Not only that, when cargo offerings were increased, each increased its sailings. That is particularly observable in the period subsequent to the commencement of the European war in September 1939. Up to that time they had been operating the defendant's weekly sailings and the plaintiffs' bi-weekly sailings. When the European war began, cargo offerings for the west coast of South America increased and both parties increased the number of their sailings, the West Coast Line advertising sailings weekly, and that frequency was continued until April 5, 1940. The Grace Line continued its schedule of weekly sailings during the entire period between August 1, 1937 and July 31, 1940,

and largely increased those after the European war started, and particularly after the plaintiffs discontinued. Each party to the agreement concededly prior to April 9, 1940, put in sufficient tonnage from time to time to take care of whatever cargo was offered.

It is not questioned that it is difficult to build up a business on irregular sailings, and both sides obviously held out to the shippers a regular schedule. It is not to be assumed that either party intended that the revenue should be decreased; on the contrary, it is to be assumed that both hoped and intended that it would grow as the business developed. The agreement, as I have said, provided for a settlement at the end of each three months. The exhibits show how closely the parties had calculated the probable result of their regular operations. Summarized, they show between August 1, 1937, when the pooling began, and April 5, 1940, the last sailing before the invasion of Denmark:

| Periods | Revenue From Grace | From West Coast | Actual Percentage carried: | | Number of Sailings: | |
|---|---|---|---|---|---|---|
| | | | By Grace | By W. Coast | Grace | W. Coast |
| 8/1 –10/31/37 | 575,850.67 | 181,736.25 | 76.01 | 23.99 | 17 | 8 |
| 11/1–1/31/38 | 593,150.17 | 204,190.42 | 74.39 | 25.61 | 18 | 8 |
| 2/1 –4/30/38 | 546,983.94 | 181,782.94 | 75.06 | 24.94 | 14 | 8 |
| 5/1 –7/31/38 | 428,053.88 | 181,344.75 | 70.24 | 29.76 | 15 | 7 |
| | | | | | 64 | 31 |
| 8/1 –10/31/38 | 422,535.48 | 128,641.48 | 76.66 | 23.34 | 14 | 6 |
| 11/1–1/31/39 | 462,852.96 | 164,062.61 | 73.87 | 26.13 | 14 | 7 |
| 2/1 –4/30/39 | 481,211.99 | 160,464.89 | 75. | 25. | 13 | 6 |
| 5/1 –7/31/39 | 465,569.00 | 160,333.59 | 74.38 | 25.62 | 15 | 7 |
| | | | | | 56 | 26 |
| 8/1/39–10/31/39 | 586,165.88 | 179,588.69 | 76.54 | 23.46 | 15 | 7 |
| 11/1 –1/31/40 | 880,708.47 | 263,192.33 | 76.96 | 23.04 | 20 | 11 |
| 2/1 –4/5/40 | 777,211.28 | 219,941.62 | 77.95 | 22.95 | 16 | 9 |
| | 6,220,293.72 75.44% | 2,025,299.57 24.56% | | | 51 | 27 |

414

This computation shows that over the entire period of their dealings, they so regulated their sailings that there was an overage on the part of Grace Line of only .44% of a gross revenue of $8,245.593.29.

If the remaining portion of the 11th pool period to April 30, 1940, and the 12th period to July 31, 1940, when obviously there was no usual joint operation, is to be considered, these results are revealed:

| | |
|---|---|
| Defendant's revenue through April 5, 1940 | $777,211.28 |
| From then to April 30, 1940 | 211,363.97 |
| | |
| Total earned with 20 sailings | 988,575.25 |
| Plaintiffs' revenue at April 5, 1940 and April 30, 1940, with 9 sailings | 219,954.39 |
| | |
| Total | 1,208,529.64 |
| Of which there would be due to plaintiffs to equalize its 25% participation | 82,178.02 |
| And for the twelfth pool period from May 1 to July 31, 1940, defendants' net revenue with 19 sailings was | 989,272.89 |
| Plaintiffs' with but 3 sailings of June 9, 20 and July 20, which apparently were made to preserve plaintiffs' membership in the conference described in the agreement | 115,413.28 |
| | |
| Total | 1,104,686.17 |
| 25% of which would be more than twice as much as plaintiffs had contributed to the pool, leaving due to them in addition to their contribution, | $276,171.54 |
| 39% more than they had earned. | $160,758.26 |

Under the circumstances, therefore, I direct a verdict for the plaintiff in the sum of $16,231.30, with interest from May 1st, 1940. I have made findings of fact and conclusions of law, which will be filed herewith.